## LOCAL 1277, METROPOLITAN COUNCIL NO 23, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO v CITY OF CENTER LINE

Docket No. 63505. Argued June 2, 1981 (Calendar No. 1).—Decided December 7, 1982.

A compulsory arbitration panel was convened upon the break-down of negotiations between the City of Center Line and Local 1277, Metropolitan Council No. 23, American Federation of State, County and Municipal Employees, AFL-CIO at the request of the union, which represented the city's police officers. The panel awarded the inclusion of a clause in the collective-bargaining agreement between the city and the union which provided that any layoff of police officers because of general lack of funds could be made only in conjunction with layoffs and cutbacks in other city departments. The Macomb Circuit Court, Hunter D. Stair, J., upon the union's motion to confirm the award, ordered summary judgment for the union and enforced the award. The Court of Appeals, N. J. Kaufman, P.J., and T. M. Burns and Bashara, JJ., affirmed in a per curiam decision (Docket No. 78-553). The city appeals.

In a unanimous opinion by Justice Williams, the Supreme Court *held:*

The compulsory arbitration panel exceeded its authority in awarding the inclusion of the layoff clause. A municipal employer's initial decision to lay off employees is not a mandatory subject of bargaining, although the effect of such a decision is a mandatory subject. The panel's award went beyond merely dealing with the effect of a decision to lay off and deprived the city of its ability to make a policy decision within the scope of its management prerogative. The award cannot be enforced.

1. The statute which provides for compulsory arbitration in

REFERENCES FOR POINTS IN HEADNOTES

[1] 48A Am Jur 2d, Labor and Labor Relations § 1838 *et seq.*

[2, 4, 5] 48 Am Jur 2d, Labor and Labor Relations § 998 *et seq.*

[3, 4, 5] 48A Am Jur 2d, Labor and Labor Relations §§ 1764, 1770, 1790, 1791.

[6] 48A Am Jur 2d, Labor and Labor Relations §§ 1770, 1790, 1791.

labor disputes involving municipal police and fire departments is clearly constitutional. The standards provided are as reasonably precise as the subject matter requires or permits, and there is adequate provision for political accountability.

2. The scope of the authority of a compulsory arbitration panel to compel agreement on an issue is not specifically delineated in the compulsory arbitration statute. However, it can be inferred from an analysis of the public employee relations act along with the compulsory arbitration act and the precedents established by federal courts in interpreting the National Labor Relations Act, from which PERA was derived, with respect to mandatory subjects of bargaining. Michigan has adopted the federal view that issues involving wages, hours, and other terms and conditions of employment constitute mandatory subjects of bargaining. Under PERA, the parties have a duty to bargain in good faith with respect to those issues. Because the compulsory arbitration act complements PERA, the scope of the arbitration panel's authority to compel agreement is limited to issues involving mandatory subjects of bargaining.

3. The compulsory arbitration statute was enacted to provide an alternate and binding procedure for the resolution of disputes involving police and fire departments so as to foreclose strikes when an impasse in negotiations with respect to a mandatory subject of bargaining is reached. The Legislature did not intend to give an arbitration panel unbridled authority to compel agreement on permissive subjects of bargaining for which parties have no duty to bargain under PERA.

4. The layoff provision in the agreement between the city and the police is not a mandatory subject of bargaining. The initial decision to lay off employees is within the scope of the city's management prerogative. The provision unduly restricts the city in its ability to make decisions regarding the size and scope of municipal services and renders it unable to function effectively. However, the effect of a decision to lay off is a mandatory subject, and can be an issue decided by a compulsory arbitration panel.

Reversed.

91 Mich App 337; 283 NW2d 741 (1979) reversed.

1. LABOR RELATIONS — POLICE AND FIRE DEPARTMENTS — COMPULSORY ARBITRATION — CONSTITUTIONAL LAW.

The statute which provides for compulsory arbitration of labor disputes in municipal police and fire departments is a constitutional delegation of legislative power, providing standards as

reasonably precise as the· subject matter requires or permits and adequate political accountability (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

2. LABOR RELATIONS — POLICE AND FIRE DEPARTMENTS — COMPUL-SORY ARBITRATION — SUBJECTS OF BARGAINING.

The scope of the authority of an arbitration panel, convened under the municipal compulsory arbitration act, to compel agreement is not specifically delineated but may be inferred from an analysis of the provisions of the public employee relations act together with the compulsory arbitration act and federal precedents established in interpreting similar provisions of the National Labor Relations Act to be limited to mandatory subjects of bargaining (29 USC 158[d]; MCL 423.215, 423.231 *et seq.;* MSA 17.455[15], 17.455[31] *et seq.).*

3. LABOR RELATIONS — PUBLIC EMPLOYMENT RELATIONS ACT — DUTY TO BARGAIN — SUBJECTS OF BARGAINING.

Public employers and employees have a duty to bargain collectively under the public employment relations act with respect to wages, hours, and other terms and conditions of employment, but need not bargain with respect to subjects which fall outside the scope of those mandatory subjects (MCL 423.215; MSA 17.455[15]).

4. LABOR RELATIONS — PUBLIC EMPLOYMENT — COLLECTIVE BARGAIN-ING — SUBJECTS OF BARGAINING.

The distinction between mandatory and permissive subjects of bargaining plays a vital role in the bargaining dynamics of the public sector even though public employees may not resort to strike to achieve a demand in regard to a mandatory subject, and thus federal precedent in distinguishing between manda-tory and permissive subjects in the private sector as well as Michigan precedent may be looked to for guidance in determin-ing whether a particular issue is a mandatory subject of bar-gaining.

5. LABOR RELATIONS — POLICE DEPARTMENTS — SUBJECTS OF BAR-GAINING.

An initial decision of a municipal employer to lay off police officers is within the scope of the management prerogative and is not a mandatory subject of collective bargaining; however, the effect of such a decision is a mandatory subject, and therefore a municipal employer may be compelled to bargain with respect to the effect of layoffs but not to the initial decision to lay off employees.

6. LABOR RELATIONS — POLICE DEPARTMENTS — COMPULSORY ARBITRA-
   TION — LIMITS ON AWARDS.

   An award by a compulsory arbitration panel which requires the
   insertion of a clause in a collective-bargaining agreement be-
   tween a municipal employer and a police officer's union which
   would deprive the employer of its ability to make a policy
   decision whether to lay off police officers exceeds the authority
   of the panel and may not be enforced.

*Maurer, Kalls, Long & Bunn* (by *George M. Maurer, Jr.)* for plaintiff.

*Rogensues, Hacker & Easter, P.C.* (by *Roy W. Rogensues),* for defendant.

Amici Curiae:

*Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P.C.* (by *Theodore Sachs* and *Mary Ellen Gurewitz),* for Michigan State Fire Fighters Union and National Union of Police Officers, Local 502, SEIU, AFL-CIO.

WILLIAMS, J.

## INTRODUCTION

The issue presented to us in this case is whether an Act 312 arbitration panel had the authority to compel inclusion of a layoff clause in a collective-bargaining agreement between Center Line police officers and the City of Center Line. The layoff clause at issue provides: "The word 'layoff' means a reduction in the working force due to a decrease of work or general lack of funds. If for lack of funds, police officers may be laid off only in conjunction with layoffs and cutbacks in other departments."

The constitutionality of Act 312 was upheld in *Detroit v Detroit Police Officers Ass'n,* 408 Mich

410; 294 NW2d 68 (1980), and, thus, we do not review this issue here. The initial decision to lay off is not a mandatory subject of bargaining and, therefore, beyond the scope of the panel's authority. To hold otherwise would raise serious questions regarding political accountability for major policy decisions. The effect of that decision is, on the other hand, a mandatory subject. Therefore, bargaining to that extent may be compelled.

## I. Facts

The City of Center Line and Local 1277, Metropolitan Council No. 23, AFSCME, AFL-CIO (hereinafter the union), the duly recognized bargaining agent for police officers involved in the instant case, began collective-bargaining negotiations in order to formulate a new contract in January, 1976. The negotiations proved unsuccessful, and on May 26, 1976, the union invoked Act 312 compulsory arbitration. MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.*

On June 14, 1976, the city notified three of the eight patrolmen employed that on July 8 they were to be laid off. The union then obtained an order from the Macomb Circuit Court, Judge Frank Jeanette, which in essence referred the layoff issue to Act 312 arbitration and restrained the layoffs pending a decision by the arbitration panel.

The arbitration panel issued an interim opinion on August 12, 1976, which determined that the layoffs as well as the withholding of shift differential allowances and clothing allowances pending a final decision by the Act 312 panel were improper and prohibited. On September 7, 1976, Judge Jean-

ette issued a permanent injunction granting the relief awarded by the arbitration panel, including an injunction against the layoffs. The city appealed the judgment to the Court of Appeals, which affirmed on September 8, 1977. *Metropolitan Council No 23, Local 1277, AFSCME, AFL-CIO v Center Line,* 78 Mich App 281; 259 NW2d 460 (1977), *lv den* 402 Mich 814 (1977). This decision is not the subject of our review.

The Act 312 arbitration continued as to the major issues, and on February 25, 1977, the opinion of the panel was issued. The opinion included the provision with regard to layoffs at issue in the instant case which states: "The word 'layoff' means a reduction in the working force due to a decrease of work or general lack of funds. If for lack of funds, police officers may be laid off only in conjunction with layoffs and cutbacks in other departments." The union filed a motion to confirm the Act 312 award, and on January 27, 1978, the circuit court ordered summary judgment for the union and enforced the award.

The Court of Appeals, on July 11, 1979, in a per curiam decision, affirmed the circuit court, thus upholding the arbitration award. *Local 1277, Metropolitan Council No 23, AFSCME, AFL-CIO v Center Line,* 91 Mich App 337; 283 NW2d 741 (1979).

We held the instant case in abeyance pending a decision in *Metropolitan Council No 23, AFSCME v Oakland County Prosecutor,* 409 Mich 299; 294 NW2d 578 (1980), as it seemed that it might be decisive of the issues presented in the instant case. On December 19, 1980, after the decision in *Oakland County Prosecutor* was issued, we granted

leave to appeal and requested that the parties "include among the issues to be briefed: whether the arbitration provision respecting layoffs was within the authority of the arbitration panel". 410 Mich 868 (1980).

## II. CONSTITUTIONALITY OF ACT 312

Appellant attempts to raise the recurring issue of the constitutionality of Act 312, MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.* The constitutionality of the compulsory arbitration statute was thoroughly examined in *Detroit v Detroit Police Officers Ass'n,* 408 Mich 410; 294 NW2d 68 (1980). This Court held that Act 312 was constitutional. We further held that the act as amended provides standards as reasonably precise as the subject matter requires or permits and that there is adequate political accountability to withstand a constitutional attack. 408 Mich 480, 505. Therefore, there is no need for us to review this issue any further. Act 312 is clearly constitutional, and as such it is applicable in this case.

## III. AUTHORITY OF THE ACT 312 ARBITRATION PANEL

### A

The real substantive issue to be addressed in this case is whether the Act 312 compulsory arbitration panel had the authority to order the inclusion of a layoff provision in the collective-bargaining agreement between the city and the union. The layoff provision at issue in the instant case provides: "The word 'layoff' means a reduction in the working force due to a decrease of work or general lack of funds. *If for lack of funds, police*

*officers may be laid off only in conjunction with layoffs and cutbacks in other departments".* (Emphasis added.)

The arbitration panel rejected both parties' proposals with regard to layoffs. The union's offer was to continue the layoff language as provided in the previous collective-bargaining agreement. The prior contract stated:

"(a) The word 'layoff' means a reduction in the working force due to a decrease of work.

"(b) In all cases of layoff the principle of straight seniority by department shall be observed and length of service shall govern.

"(c) The employer will, whenever possible, give at least seven (7) days notice prior to layoff to the employees affected together with a list of the names of said employees to the union."

The city, on the other hand, proposed an offer of settlement that would eliminate the definition of layoff included in the prior contract and have nothing in the contract restricting the layoff decision.

The ultimate language adopted was developed by the arbitration panel itself.[1] The rationale for including such a clause with its compromise language was supposedly to protect the police officers from retaliatory layoffs due to the union's lack of cooperation in fiscal matters.

The Court of Appeals noted the reason given for the inclusion of this clause and stated that: "[w]e do not perceive the language as restricting the

[1] The question of last offer arbitration was not raised with respect to this layoff provision. The theory involved is that last offer arbitration applies only to economic issues and that the arbitrator has the power to say what is and is not economic. The issue was designated non-economic. As the question was not raised, we express no opinion.

basic legislative choices of the city in providing municipal services, and we conclude that the award was within the power of the arbitration panel". *Local 1277, Metropolitan Council No 23, AFSCME, AFL-CIO v Center Line,* 91 Mich App 337, 342; 283 NW2d 741 (1979). In fact, the Court of Appeals found that, given the previous contract between these parties, the clause actually expanded management rights. The layoff clause in the prior agreement was interpreted to totally prohibit layoffs solely for economic reasons, while the new clause merely stated that layoffs had to be made in conjunction with layoffs in other departments. *Id.*

In deciding whether or not the Act 312 arbitration panel had the authority to order the inclusion of the layoff clause, it is necessary first to analyze Act 312 itself. As stated in MCL 423.231; MSA 17.455(31), the act intended "to afford an alternate, expeditious, effective and binding procedure for the resolution of [interest] disputes". Compulsory arbitration in police and fire disputes was seen as a necessary tradeoff for the prohibition against striking. The legislative intent of Act 312 has been discussed on numerous occasions, see *Detroit v Detroit Police Officers Ass'n, supra,* and *Metropolitan Council No 23, AFSCME v Oakland County Prosecutor,* 409 Mich 299; 294 NW2d 578 (1980), and was succinctly summarized by Justice COLEMAN in *Dearborn Fire Fighters Union Local No 412, IAFF v Dearborn,* 394 Mich 229, 278-279; 231 NW2d 226 (1975).[2] She stated:

---

[2] It should be noted that Justice COLEMAN dissented in *Detroit v DPOA, supra,* 578, and stated: "The researcher will note that in *Dearborn Fire Fighters v Dearborn,* 394 Mich 229; 231 NW2d 226 (1975), I wrote to the opposite of the opinion I have now signed. [Footnote omitted.] I must confess to a starry-eyed vision of how the 1969 legislative form of compulsory arbitration should operate—but it has not. More importantly, I am now convinced that it cannot operate constitutionally under the present statute."

"PERA procedurally requires the parties to meet at the bargaining table and confer in good faith with an open mind and a sincere desire to reach an agreement. It does not mandate agreement. If the parties fail to agree on one or more mandatory subjects, an 'impasse' situation is reached and the employer may take unilateral action on an issue consistent with its final offer to the employees' representative. The duty to bargain is then suspended until there is a change in the surrounding conditions or circumstances.

"In the private sector 'impasse' often results in a strike. The employees refuse to accept the unilateral conditions imposed by the employer and withhold their services as a bargaining weapon. In the public sector strikes are prohibited but nevertheless occur. If the public employees do strike, the public employer may resort to the courts in order to return the labor situation to the status quo. By the time that court relief is obtained, however, the public may well have been left for a long period without the services and protection of the striking employees.

"When policemen engage in a strike, the community becomes immediately endangered by the withdrawal of their services. Likewise, our case law has often focused on the fact that fire fighters have a distinct and crucial employment relationship with a public employer.

"The Legislature, with knowledge of the vital character of police and fire services and with reference to the specific recommendations of the Governor's Advisory Committee on Public Employee Relations (February, 1967) moved to foreclose strikes to police officers and fire fighters by enacting 1969 PA 312." (Footnotes omitted.)

The manifest intent of Act 312 is clear. The exact scope of the arbitration panel's authority, on the other hand, is not so easily discerned from the words or intent of the act.

While Act 312 does not specifically delineate the scope of the arbitration panel's authority, it can be inferred from an analysis which considers the

public employee relations act (PERA), MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.,* and Act 312 together. As stated in § 14, Act 312 was clearly intended to supplement PERA. MCL 423.244; MSA 17.455(44). *Council No 23 v Oakland County Prosecutor, supra,* 409 Mich 320; *Alpena v Alpena Fire Fighters Ass'n,* 56 Mich App 568, 575; 224 NW2d 672 (1974), overruled in part, *Detroit v DPOA,* 408 Mich 483, fn 65.

Under § 15 of PERA, to bargain collectively "is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to *wages, hours, and other terms and conditions of employment".* (Emphasis added.) MCL 423.215; MSA 17.455(15). This language is identical to that of § 8(d) of the National Labor Relations Act (NLRA), 29 USC 158(d), and, thus, federal precedents are helpful in exploring the issues at hand. *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 53; 214 NW2d 803 (1974).

Those issues that fall into the category of "wages, hours and other terms and conditions of employment" are deemed to be mandatory subjects of bargaining. 391 Mich 54-57. In contrast, permissive subjects of bargaining are those subjects that fall outside the scope of those designated as mandatory subjects. The parties are not required to bargain over them, but they may do so voluntarily. *Pontiac Police Officers Ass'n v Pontiac,* 397 Mich 674, 679-681; 246 NW2d 831 (1976). A third category of bargaining subjects is illegal subjects. Illegal subjects will not be enforced even if the parties agree to bargain over such issues.[3]

---

[3] For a general discussion of the three categories of bargaining in the private sector, see Bartosic & Hartley, *Labor Relations Law in the Private Sector* (ALI-ABA, 1977), pp 157-165; Gorman, *Basic Text on Labor Law Unionization & Collective Bargaining* (West Publishing Co,

In general, Michigan has adopted the federal courts' approach as to what constitutes a mandatory subject of bargaining and thus has used the phrase "other terms and conditions of employment". See *Central Michigan University Faculty Ass'n v Central Michigan University,* 404 Mich 268, 277; 273 NW2d 21 (1978), and *Van Buren Public School Dist v Wayne Circuit Judge,* 61 Mich App 6, 27; 232 NW2d 278 (1975).

The distinction between a mandatory and a permissive subject of bargaining is a very significant one. In the private sector, parties are required to bargain in good faith regarding mandatory subjects of bargaining. Also, a party may insist to impasse on such a subject and resort to economic weapons in order to achieve its demand. When a permissive subject is involved, however, neither party is obligated to discuss the subject, nor can a party insist to impasse on that subject. *NLRB v Wooster Division of Borg-Warner Corp,* 356 US 342, 349; 78 S Ct 718; 2 L Ed 2d 823 (1958).

In the public sector, regardless of the subject nature, the parties are prohibited from striking. MCL 423.202; MSA 17.455(2). Nonetheless, the distinction between mandatory and permissive subjects plays a vital role in the bargaining dynamics of the public sector.[4] It is only with respect to mandatory subjects that there is a duty to bargain under § 15 of PERA.[5] MCL 423.215; MSA

1976), pp 496-531. With respect to bargaining in the public sector specifically, see Anno: *Bargainable or Negotiable Issues in State Public Employment Relations,* 84 ALR3d 242.

[4] For articles on the scope of bargaining in the public sector, see Sackman, *Redefining the Scope of Bargaining in Public Employment,* 19 Boston Col L Rev 155 (1977); Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich L Rev 885 (1973).

[5] It should be noted that even if the parties agree to discuss a permissive subject of bargaining it does not thereafter become a mandatory subject. Thus, the fact that the layoff decision may have

17.455(15). In spite of the differences between the public and private sector with regard to economic weapons, it has been held in numerous Michigan decisions that federal precedent in distinguishing between mandatory and permissive subjects is relevant and persuasive. *Central Michigan University, supra; Pontiac Police Officers Ass'n, supra; Rockwell v Crestwood School Dist Board of Education,* 393 Mich 616, 636; 227 NW2d 736 (1975); *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 54; 214 NW2d 803 (1974). Therefore, it is useful to look to federal law as well as Michigan law for guidance to determine whether the layoff provision at issue in the instant case is a mandatory subject of bargaining.

The distinction drawn between mandatory and permissive subjects of bargaining is significant in determining the scope of the Act 312 arbitration panel's authority. Given the fact that Act 312 complements PERA and that under § 15 of PERA the duty to bargain only extends to mandatory subjects, we conclude that the arbitration panel can only compel agreement as to mandatory subjects. It would be inconsistent to conclude that the arbitration panel can issue an award on a permissive subject when the parties do not even have a duty to bargain over such a subject. To hold otherwise would grant the Act 312 arbitration panel a free hand to compel agreement on any matters, even those beyond "wages, hours and other terms

been a subject of bargaining in past contract negotiations does not make such a subject mandatory for future collective-bargaining agreements. See *City of Taunton v Taunton Branch of the Massachusetts Police Ass'n,* — Mass App —; 406 NE2d 1298, 1302 (1980). Two New York decisions, for example, have held that job security, while not a mandatory subject of bargaining, is a permissive subject that can be bargained over if the parties voluntarily agree. *Burke v Bowen,* 40 NY2d 264; 386 NYS2d 654; 353 NE2d 567 (1976); *Board of Education of Yonkers City School Dist v Yonkers Federation of Teachers,* 40 NY2d 268; 386 NYS2d 657; 353 NE2d 569 (1976).

and conditions of employment". It is clear that the Legislature, while interested in foreclosing strikes in police and fire departments and providing an "alternate, expeditious, effective and binding procedure for the resolution of disputes" did not intend for the arbitration panel to have unbridled authority.[6]

B

The layoff clause at issue in this case is not easily labeled a mandatory or permissive subject of bargaining. The case law in this area varies substantially, given different fact situations and different treatment by various courts. Nonetheless, an analysis of the case law and its application to this layoff clause leads us to conclude that the layoff provision in this particular case is *not* a mandatory subject of bargaining. Therefore, it was beyond the scope of authority of the Act 312 arbitration panel to order the parties to include such a clause in their agreement.

Several United States Supreme Court cases have discussed mandatory subjects of bargaining in the private sector.

In *Fibreboard Paper Products Corp v NLRB,* 379 US 203; 85 S Ct 398; 13 L Ed 2d 233 (1964), the Supreme Court held that, based on the particular facts before it,[7] the "contracting out" of work

---

[6] For cases holding that mandatory subjects of bargaining are within the Act 312 arbitration panel's scope of authority, see *Roseville v Local 1614, International Ass'n of Firefighters, AFL-CIO,* 53 Mich App 547, 558-559; 220 NW2d 147 (1974), *lv den* 393 Mich 759 (1974); *Local 1518, AFSCME, AFL-CIO, Michigan Council 55 v St Clair County Board of Comm'rs,* 43 Mich App 342, 344-345; 204 NW2d 369 (1972).

[7] In *Fibreboard,* the employer informed the union that the decision had been made to "contract out" the maintenance work performed by union members because substantial savings could be realized. Thus, bargaining would be pointless. The employees in the bargaining unit were discharged, and independent contractors were employed to do

previously performed by union members was a mandatory subject of bargaining. The decision was definitely limited to the facts of the particular case before the Court. It was emphasized by the concurrence that "[t]he Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain. Nor does the Court decide that subcontracting decisions are as a general matter subject to that duty". 379 US 218 (Stewart, J., *concurring*).

The Court went out of its way to limit its holding and emphasized that its decision would not significantly abridge the employer's freedom to manage the business as the mere replacement of employees by independent contractors was involved. There would not be any requirement of material alteration in the company's basic operation nor any additional capital investment. In the private sector, then, *Fibreboard* is a case that discussed the contracting issue and job security, but it did little to illuminate a clear path for future decisions as it was strictly limited to the facts at hand.[8]

A very recent United States Supreme Court case dealt with a similar issue in the private sector. In *First National Maintenance Corp v NLRB*, 452 US

the work. The union then proceeded to file charges of unfair labor practices against the employer.

[8] In *Van Buren Public School Dist, supra,* 61 Mich App 27, the Court of Appeals was faced with the issue of whether the contracting of school-bus driving previously performed by bargaining unit members was a mandatory subject of bargaining under § 15 of PERA. The Court discussed *Fibreboard* at length and concluded that the contracting at issue was a mandatory subject of bargaining as it concerned a "term and condition of employment" and to require bargaining of the subject furthered the statute's primary purpose. The Court of Appeals also stated that § 15 of PERA should be given an even more expansive construction than its NLRB counterpoint considering the strike prohibition for public employees.

666, 686; 101 S Ct 2573; 69 L Ed 2d 318 (1981), the issue presented was whether an employer must bargain over its decision to close a part of its maintenance service business under §§ 8(d) and 8(a)(5) of the NLRA. The Court held that the decision itself is *not* a mandatory subject of bargaining included within the phrase "terms and conditions of employment". The Court concluded that "the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision".[9]

Once again the Court attempted to limit its holding by noting the specific facts of the case that led to this result. There was no intention of the employer to replace the discharged employees with other employees or continue the operation elsewhere. The dispute arose because the management fee paid by Greenpark Care Center was reduced and caused the employer to lose money on that service contract. Also, there was no claim of anti-union animus, and the bargaining representative was not selected or certified until after the economic difficulties had ensued. Thus, this case was seen as factually distinguishable from *Fibreboard.* The Court concluded by stating that "[t]he decision to halt work at this specific location represented a significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely". 452 US 688; 101 S Ct 2585; 69 L Ed 2d 337.

---

[9] The Court further limited its holding by noting in a footnote that it expressed no view as to other types of management decisions. Thus, the Court was concerned solely with the facts and circumstances before it and declined to make any decision regarding such issues as plant relocations, sales, other kinds of subcontracting or automation. 452 US 686, fn 22; 101 S Ct 2584; 69 L Ed 2d 335.

While the subject at issue in the instant case deals with layoffs, the discussion in these cases regarding subcontracting is relevant. It can be argued that the instant case is more closely aligned with *First National Maintenance Corp* than *Fibreboard* as the police officers were not going to be replaced and the decision to lay off employees is similar to the closing down of part of a business. As the city stated in its brief, it must be allowed to make decisions regarding the layoffs as it may be best for the people of Center Line at some point to abolish the independent police force altogether. Such a decision is very similar to the closing of a business, which has been held in some cases not to be a mandatory subject in the private sector. Of course, it must be kept in mind that these cases were limited to the facts before the Court.

The National Labor Relations Board and lower federal courts have also struggled with the issue of whether layoffs or subcontracting are mandatory subjects of bargaining.

The National Labor Relations Board held in *United States Gypsum Co,* 94 NLRB 112, 114-115 (1951), that the union's proposal that layoffs should be made according to seniority was a condition of employment and, thus, bargainable. This opinion, however, was amended, and due to representation problems the unlawful refusal to bargain charge was dismissed. 97 NLRB 889 (1951), *modified* 206 F2d 410 (CA 5, 1953), *cert den* 347 US 912 (1954).

Application of the *Fibreboard* analysis has not been an easy task for the NLRB or the courts. In *NLRB v Adams Dairy, Inc,* 350 F2d 108 (CA 8, 1965), *cert den* 382 US 1011 (1966), the court reversed the board's decision and held that the

decision to discharge driver-salespersons and use independent contractors for product distribution was not a mandatory subject of bargaining. The court's rationale was that the change was one affecting the entire operation and capital structure and it would significantly abridge the employer's freedom to manage the business if bargaining were mandated. 350 F2d 111. Thus, *Fibreboard* would not require bargaining on such a decision.

In *Ozark Trailers, Inc,* 161 NLRB 561 (1966), the board held that a company was obligated to bargain over the decision to close a plant. The board emphasized the importance that such a decision had for the worker. A few years later, however, the board retreated somewhat from the rationale in *Ozark* and held that there was no obligation to bargain over an employer's decision to terminate the manufacturing portion of its business. *Summit Tooling Co,* 195 NLRB 479 (1972). The board reaffirmed the employer's duty to bargain over the effects of a closing. *Ozark,* however, was revitalized in *Royal Typewriter Co,* 209 NLRB 1006 (1974), where the board held that the employer's decision to close a plant as well as the effects of the decision were mandatory subjects of bargaining.

Several judicial decisions have held layoffs in the private sector to be mandatory subjects of bargaining. *NLRB v Exchange Parts Co,* 339 F2d 829, 830-831 (CA 5, 1965); *NLRB v Frontier Homes Corp,* 371 F2d 974, 979-980 (CA 8, 1967).

From a brief sampling of the case law in this area, it is apparent that whether or not a particular issue is a mandatory subject of bargaining in the private sector depends heavily on the particular facts, as well as the tribunal to which the case is presented. There is not a set guideline or standard to be used in every case. The issue of what

constitutes a bargainable subject in the public sector has also been discussed by many commentators and courts.

"Perhaps the single greatest, and almost universally recognized, limitation on the scope of bargaining or negotiation by state public employees is the concept of managerial prerogative as it has developed in the public sector. In essence, the concept creates a dichotomy between 'bargainable' issues, that is, those issues which affect conditions of employment, and issues of 'policy' which are exclusively reserved to government discretion and cannot be made mandatory subjects of bargaining." Anno: *Bargainable or Negotiable Issues in State Public Employment Relations,* 84 ALR3d 242, 255-256.

As stated earlier, the layoff provision provided that layoffs of police officers for lack of funds could only be made in conjunction with layoffs and cutbacks in other departments. We interpret this clause as one that is within the scope of management prerogative. The clause unduly restricts the city in its ability to make decisions regarding the size and scope of municipal services. As the city argued in both oral argument and its brief, the city no longer would be able to base its decision on factors such as need, available revenues, or public interest. The decision regarding layoffs could only be based on the level of services in other departments if the layoff clause was to be upheld. This severely restricts the city in its ability to function effectively and poses serious questions with regard to political accountability for such decisions.

The union, on the other hand, would like us to believe that the clause is a mild prohibition and does little to restrict the city's decision-making process. We do not agree. The clause is a mild restriction, but it speaks to the very essence of the decision. The decision to lay off police officers can

only be made in conjunction with other departments according to this clause.

While we are aware of the union's interest in the job security of its members and the perceived need to protect police officers from retaliatory layoffs in this case, the clause awarded was beyond the permissible scope of the Act 312 arbitration panel's authority. To so restrict the policy decisions of the city is beyond the legislative words and intent.

That is not to say that the union has no interest in these issues. The retaliatory layoff issue can most assuredly be dealt with in a variety of ways. The use of compulsory arbitration, however, to insure no retaliatory layoffs is not justified. Also, while the initial decision to lay off is not a mandatory subject of bargaining, and therefore cannot be compelled in an arbitration award, it is clear that there is a duty to bargain over the *impact* of that decision. Thus, the union has the ability to protect its members after the initial decision has been made. It is one thing to require the city to bargain over the *impact* of its decision to lay off police officers and quite another to permit them to lay off police officers only if layoffs are made in other departments as well.

## C

While the initial decision to lay off is not a mandatory subject of bargaining, the impact of that decision is an issue for bargaining. Several cases have discussed this fact.[10]

---

[10] In *First National Maintenance Corp, supra,* 452 US 677-678; 101 S Ct 2580; 69 L Ed 2d 330, the Court stated in a footnote that "[t]here is no doubt that petitioner was under a duty to bargain about the results or effects of its decision to stop the work at Greenpark, or that it violated that duty". For cases discussing this issue see discussion, *infra.*

In *Fire Fighters Union v Vallejo,* 12 Cal 3d 608, 621-622; 116 Cal Rptr 507; 526 P2d 971 (1974), the Court held that the decision to lay off, itself, is not a mandatory subject of bargaining, but to the extent that the decision to lay off affects the workload and safety of the remaining workers it is a bargainable and arbitrable issue. The Court also held that with regard to the manning proposal it too was bargainable and subject to arbitration to the extent that it related to workload and safety.

The Wisconsin law in this area is also significant. In *Beloit Education Ass'n v Employment Relations Comm,* 73 Wis 2d 43, 58-60; 242 NW2d 231 (1976), the Court held that the layoff proposal requiring seniority to be a basis for layoffs is a mandatory subject of bargaining so long as it does not invade the school board's right to determine curriculum. The test developed by the Wisconsin Supreme Court to distinguish a permissive subject from a mandatory subject of bargaining has been labeled the "primary relation test". A subject is a mandatory subject of bargaining if the topic "primarily" or "fundamentally" relates to wages, hours and conditions of employment. Presumably, matters of curriculum determination are not subjects of mandatory bargaining.

In reviewing a decision by the WERC in another case, the Court held that "economically motivated layoffs of public employees resulting from budgetary restraints is a matter primarily related to the exercise of municipal powers and responsibilities and the integrity of the political processes of municipal government". *City of Brookfield v Wisconsin Employment Relations Comm,* 87 Wis 2d 819, 833; 275 NW2d 723 (1979). In *Brookfield,* the Court relied on a statute which delineated municipal powers, including layoff decisions, to conclude that

a budgetary layoff decision was not a mandatory subject of bargaining. "To decide the issue to be a mandatory subject of bargaining would destroy the equal balance of power that insures the collective bargaining rights of the union and protects the rights of the general public to determine the quality and level of municipal services they consider vital."

The Court noted that the effects of the layoffs were mandatory subjects of bargaining.

"A reduction in the total work force caused by the economically motivated layoffs will affect the number of employees assigned to a particular shift and thus alter their individual fire fighting responsibilities. Therefore, there is a primary relation between the impact of the lay off decision and the working conditions of the remaining unit employees." 87 Wis 2d 833.

The Michigan Court of Appeals was faced with the issue of whether a manpower clause was within the scope of the arbitration panel's authority in *Alpena v Alpena Fire Fighters Ass'n,* 56 Mich App 568; 224 NW2d 672 (1974). The Court concluded that the manpower award was within the subject matter and jurisdiction of the arbitration panel as it concerned safety, a "condition of employment". In a similar case, the Rhode Island Supreme Court found that the minimum manpower requirement affected both the workload and safety of the fire fighters and therefore was a mandatory subject of bargaining and arbitrable. *Narragansett v International Ass'n of Fire Fighters, AFL-CIO, Local 1589,* 119 RI 506; 380 A2d 521 (1977).

The clause in this case, however, unlike the ones involved in the cases discussed above, does not involve safety. If the concern were truly over

safety, then layoffs in other departments would have no bearing on the issue. The rationale for the wording of the clause was clearly to prevent retaliatory layoffs. Also, once the decision has been made by the city, the union can bargain about the impact of that decision on workload and safety. In fact, in oral argument, counsel for the city stated that they were not contending that the impact of the decision was not subject to arbitration. Counsel stated that the effect on the safety of the remaining forces, seniority rights, "bump" rights and even the motive behind the layoff decisions are all subjects of collective bargaining. Thus, we do not foreclose bargaining or the issuance of an arbitration award covering such issues. We only hold that the initial decision is a management prerogative and that the arbitration panel cannot mandate a clause on the initial layoff decision.

The Act 312 arbitration panel involved in this case analyzed the relevant case law on the subject and concluded that the *basis* for layoff decisions was a mandatory subject of bargaining.[11] In the next paragraph of its opinion, however, the panel withdrew somewhat from this bold conclusion. The panel stated that good-faith bargaining was required on the issue but that Act 312 arbitration panels "should be very cautious in this area". The panel expressed its concern about substituting its judgment with regard to layoffs for that of the elected, politically accountable officials. The conclusion was that "without compelling reasons an arbitration panel should not substitute its judgment for that of elected officials in the area of layoffs".

The arbitration panel, in developing the compro-

---

[11] The arbitration panel also discussed the mandatory subject issue in its interim opinion and concluded that layoffs were mandatory subjects of bargaining.

mise language, felt that it achieved an equitable balance between the city's need for flexibility, the employee's security and the public's interest. It also assured against the police officers being singled out and subjected to layoffs for retaliatory reasons.

The arbitration panel's analysis seems to be more supportive of a finding that the layoff decision is one within the management prerogative and a policy decision rather than a mandatory subject of bargaining. The statements made regarding caution in substituting the panel's judgment for that of the city illustrates that this subject is one within the province of the city. We disagree with the arbitration panel's conclusion that the layoff decision is a mandatory subject of bargaining. The city, thus, cannot be compelled to agree to a clause on the subject—regardless of its compromise language.

By applying the policy-impact approach, it is clear that the initial decision to lay off public employees must be left to the public body. There can still be mandatory bargaining over the impact of such a decision, but the initial decision must be left to the politically accountable representatives.

CONCLUSION

The Act 312 arbitration panel in this case exceeded its authority with respect to the layoff clause awarded. The clause deprived the city of its ability to make a policy decision, that is, whether to lay off police officers. Such policy decisions are not mandatory subjects of bargaining. The impact of such a layoff decision, however, is subject to bargaining. The panel in this case went beyond compelling an award merely dealing with the

effect of such decision, and, thus, the award cannot be enforced.

Accordingly, we reverse the decision of the Court of Appeals and hold that the layoff clause shall not be enforced as awarded.

No costs, a public question being involved.

FITZGERALD, C.J., and KAVANAGH, LEVIN, COLEMAN, and RYAN, JJ., concurred with WILLIAMS, J.

The late Justice BLAIR MOODY, JR., took no part in the decision of this case.